## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Josephine Adu-Gyane and Rosalind Marie Lewis, as Co-Trustees for the Next-of-Kin of Kingsley Fifi Bimpong, | Case No. |
| **Plaintiffs,** | |
| v. | **COMPLAINT** |
| Joseph Moseng, Martin Jensen, and Liam O'Shea, in their individual capacities as Eagan Police Officers; Eduardo Decache, Brittany Corbin, Ramsey Strickland, Manuel Hernandez, Heather Hedden, Christopher Severson, and Lucio Manuel Marquez Zazueta, in their individual capacities as Dakota County correctional officers; and Dakota County, | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

For their Complaint, Josephine Adu-Gyane and Rosalind Marie Lewis

("Plaintiffs"), as Co-Trustees for the next-of-kin of Kingsley Fifi Bimpong, hereby state

and allege as follows:

## **Introduction**

1.      This is an action for money damages for the wrongful death of Kingsley

Fifi Bimpong ("Kingsley") on November 19, 2024[1] due to the Defendants' deliberate

---

[1] Kingsley's death certificate incorrectly denotes November 18, 2024 as the date of death; medical records correctly indicate the date of death was November 19, 2024.

indifference to Kingsley's intracerebral hemorrhage of the left cerebral hemisphere – also known as a hemorrhagic stroke.

2.      Kingsley's death should have been prevented by the individually named Defendants, who interacted with him during the critical hours on November 16-17, 2024.

3.      Instead, Defendants acted on incorrect and unfounded assumptions about Kingsley as justification for treating a person suffering from classic stroke signs and symptoms with callous indifference that resulted in his death.

4.      Eagan police officers Defendants Joseph Moseng, Martin Jensen, and Liam O'Shea initially stopped, "evaluated," and arrested Kingsley in the City of Eagan in the late evening hours on November 16, 2024.

5.      The entire time Defendants Moseng, Jensen, and O'Shea were with Kingsley, he was obviously suffering from a serious medical condition *and* did not have the freedom to end the interaction and seek medical care – he was in Eagan police custody.

6.      While Kingsley was in their custody, Defendants Moseng, Jensen, and O'Shea had a constitutional duty to ensure his safety and well-being.

7.      Instead, Defendants Moseng, Jensen, and O'Shea acted with deliberate indifference to Kingsley's obvious and serious medical needs over the course of a critical **2 hours and 16 minutes**.

8.      Kingsley was with one, two, or all three of the individually named Eagan Defendants – Moseng, Jensen, and O'Shea – continuously from 10:44 pm on November

16, 2024, until he was left at the Dakota County Jail (the "Jail") in the early morning hours of November 17, 2024.

9.      The deliberate indifference of the individually named Eagan Defendants proximately caused Kingsley to deteriorate as he suffered from obvious and serious medical needs.

10.     Yet, the individually named Eagan Defendants decided not to act on what they knew from the beginning of their interactions with Kingsley.

11.     Instead of bringing Kingsley to the hospital, they took him first to the Eagan Police department and later to the Jail.  All the while Kingsley desperately needed emergent medical attention he never received.

12.     Then, at the Jail several Dakota County correctional officers (COs) – Defendants Eduardo Decache, Brittany Corbin, Ramsey Strickland, Manuel Hernandez, Heather Hedden, Christopher Severson, and Lucio Manuel Marquez Zazueta – likewise acted with deliberate indifference to Kingsley's obvious and serious medical needs.

13.     The individually named Dakota County Defendants *repeatedly* watched as Kingsley suffered – mostly writhing on the floor of his Jail cell, lying in his own urine – over the next **3 hours and 24 minutes** until he was u*nresponsive, cold to the touch, and foaming at the mouth* in his cell around 4:33 am on November 17, 2024.  It was only when Kingsley was on death's door that Jail and medical staff entered his cell.

14.     During Kingsley's detention at the Jail, he was in the custody and control of Dakota County.

3

15.     During Kingsley's detention at the Jail, Dakota County had a nondelegable constitutional duty to provide adequate medical treatment to those within its custody, including Kingsley.

16.     Dakota County contracted with Advanced Correctional Healthcare ("ACH") to provide health-care services to inmates at the Jail.  Via this contract, Jessica Lynne Holman – a registered nurse – was working at the Jail while Kingsley was in custody.

17.     Dakota County's contract with ACH does not immunize the County from liability for damages when the constitutional duty to provide adequate medical treatment is unfulfilled.

18.     The deliberate indifference of the individually named Dakota County Defendants and Dakota County proximately caused Kingsley to deteriorate at the Jail as he continued to suffer from known, serious medical needs.

19.     As Kingsley approached death, Defendant Corbin *finally* openly questioned his well-being, which caused Nurse Holman and Defendant Decache to enter Kingsley's cell where they found him with the pallor of a corpse.

20.     Medical interventions failed.

21.     At United Hospital, Kingsley was determined to be brain dead.

22.     Eventually, Kingsley's family members – some of whom reside in Ghana – were contacted and made the difficult decision to disconnect Kingsley from a ventilator.

23.     Per his medical records, Kingsley was terminally extubated and cardiac death was pronounced at 12:23 pm on November 19, 2024.

4

24.    For a hemorrhagic stroke, every minute of every hour counts.

25.    For Kingsley, every minute of deliberate indifference over the course of **5 hours and 40 minutes** compounded and resulted in his death.

26.    Regardless of the underlying cause of Kingsley's serious medical needs, each individually named Defendant witnessed that Kingsley was exhibiting obvious and serious physical and cognitive abnormalities that required urgent medical attention.

27.    But, over those 5 hours and 40 minutes, Kingsley exhibited many of the tell-tale signs of a stroke that are: 1) commonly reviewed in the training received by both police officers and correctional officers, nationwide, *and* 2) known by lay persons.

28.    The deliberate indifference of the individually named Defendants – by their actions and inactions – as well as that of Dakota County proximately caused Kingsley's death.

29.    Plaintiffs were appointed Co-Trustees for Kingsley's Next-of-Kin on July 8, 2025, by Judge Leonardo Castro.  Plaintiff Rosalind Marie Lewis is the mother of Kingsley's minor child.  Plaintiff Josephine Adu-Gyane is Kingsley's cousin.  A copy of Judge Castro's Order is attached hereto as Exhibit A.

30.    Plaintiffs, as the Co-Trustees for Kingsley's Next-of-Kin, bring this action against the Defendants pursuant to 42 U.S.C. §§ 1983 and 1988, the Eighth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this action.

31.     As this action arises purely under federal law, state-law claims, and by consequence the limitations and defenses under state law, are not applicable to this civil-rights lawsuit, including the state wrongful-death measure of damages.

32.     Venue is proper in this Court under 28 U.S.C. § 1391, as a substantial part of the events giving rise to this action occurred in this District.

### The Parties

33.     Kingsley was at all times material herein a lawful permanent resident (i.e., green card holder) of the United States and a resident of Cottage Grove, Minnesota.  He was born on June 19, 1974, making him 50 years old at the time of his death.

34.     As a green card holder, Kingsley was entitled to the same constitutional rights as citizens of the United States.

35.     At the time of his death, Kingsley had been working for the United States Postal Service since November 2016.

36.     Kingsley was black and, at the time of his arrest and death, wore his hair in dreadlocks.

37.     Kingsley had **no** criminal history.

38.     Further, Kinglsey had nothing in his background raising any red flags for the Defendants to suspect drug use or abuse.

39.     Defendant Joseph Moseng was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a police officer for the City of Eagan.  He is sued in his individual capacity.

40.    Defendant Moseng was a Sergeant at the time of his deliberate indifference to Kingsley's obvious and serious medical needs.

41.    Defendant Martin Jensen was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a police officer for the City of Eagan.  He is sued in his individual capacity.

42.    Defendant Jensen was a Drug Recognition Evaluator at the time of his deliberate indifference to Kingsley's obvious and serious medical needs.

43.    Defendant Liam O'Shea was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a police officer for the City of Eagan.  He is sued in his individual capacity.

44.    Defendant Dakota County is a "public corporation," suable under Minn. Stat. § 373.01, subd. 1(a)(1).  Dakota County is, and at all times material herein was, a political entity charged with control and supervision of the Jail, located in Hastings, Minnesota, and ensuring that constitutionally appropriate medical care was provided to all Jail inmates and detainees.

45.    Defendants Eduardo Decache, Brittany Corbin, Ramsey Strickland, Manuel Hernandez, Heather Hedden, Christoper Severson, and Lucio Manuel Marquez Zazueta[2] were at all times material herein citizens of the United States, residents of the State of

---

[2] Upon information and belief, Lucio Manuel Marquez Zazueta is denoted as "L. Marquez" within the Dakota County Jail Guardian RFID system.  As such, he will be referenced akin to how he was at work – herein, Defendant Marquez.

Minnesota, and acting under color of state law as correctional officers at the Jail.  They are sued in their individual capacities.

## **The First 12 Minutes of Deliberate Indifference**

46.     On the evening of November 16, 2024, Kingsley left work at the U.S. Postal Service early due to a headache and decreased vision.

47.     Around 10:42 pm on November 16, 2024, Kingsley was observed by Defendant Moseng making a southbound left turn on a red turn signal.

48.     Notably, Kingsley turned left into the northbound lanes, driving into *oncoming traffic*.  As he did so, Kingsley hit and drove up onto the center median.

49.     Moseng activated his emergency lights and Kingsley slowed down and stopped his vehicle.

50.     Moseng approached Kingsley's vehicle – first making contact with Kingsley at 10:44 pm.

51.     Upon first contact, it was obvious something was very wrong, and the evidence of Kingsley's disconcerting condition only increased with each passing moment.

52.     Kingsley was very confused.

53.     Kingsley could not tell Moseng what was happening and could not articulate a complete sentence or thought.  Instead, Kingsley kept repeating short phrases such as: "I want to go…" and "I don't know…"

54.     Kingsley could not tell Moseng the simplest of facts – his own name, where he was coming from, where he was going, or where he lived.

55.     From Moseng's body-worn camera (BWC) video footage, it is impossible to determine whether Kingsley even understood any of the questions he was asked during the initial interaction with Moseng and those to follow as other officers responded.

56.     Kingsley demonstrated an inability to follow simple directions.  For example, he did not understand what to do when Moseng asked him to shut off his car and handed over his keys when Moseng asked for his driver's license.

57.     Eventually, Kingsley exited his vehicle.

58.     Kingsley was off-balance and stumbled as he did so.

59.     Kingsley exhibited serious physical and cognitive abnormalities.

60.     At approximately 10:48 pm – **4 minutes** into the stop – Defendant Liam O'Shea arrived on scene.

61.     Shortly thereafter, Moseng requested Defendant Jensen's assistance.

62.     Jensen was a Drug Recognition Evaluator (DRE).

63.     To become a DRE, Jensen had to go through significant additional training.

64.     The first goal of such training, according to the Minnesota State Patrol's website, is to "[d]etermine if an individual is impaired by drug(s), alcohol, a combination of both, ***or if they suffer from an injury or illness to show similar signs of impairment***." (emphasis added).

65.     Jensen's advanced training focused on the following concepts and skills fundamental to a DRE's job:

- Understanding definitions and language relating to drug impairment and investigation.

9

- Gaining a deeper understanding of the seven classifications of drugs.

- Obtaining hands-on practice of the evaluation to be used in the field.

- Learning how to conduct the evaluation and what signs to look for.

66. The objectives of DRE training are to:

- Describe the involvement of drugs in impaired driving incidents.

- Name the seven categories of drugs and recognize their effects.

- Describe and properly administer the psychophysical and physiological evaluations used in the drug evaluation and classification procedures.

- Document the results of the drug evaluation and classification examination.

- Properly interpret the results of the examination.

- Prepare a narrative drug influence report.

- Discuss appropriate procedures for testifying in typical drug evaluation and classification cases.

- Maintain an up-to-date and relevant curriculum log (curriculum vitae).

67. The DRE training includes formal presentations on the following:

- Drugs in society and in motor vehicle operation.

- Development and effectiveness of the drug evaluation and classification program procedures.

- An overview of physiology and drugs.

- An overview of the drug evaluation curriculum program procedures.

- Eye examinations (horizontal gaze nystagmus; vertical gaze nystagmus; lack of convergence; estimation of pupil size; pupil reaction to light).

- Vital signs examinations (pulse rate; blood pressure; temperature).

- The physician's desk reference, and other reference materials.

- The seven categories of drugs (central nervous system depressants; central nervous system stimulants; hallucinogens; dissociative anesthetics; narcotic analgesics; inhalants; cannabis).

- Drug combinations.

- Narrative arrest report in drug evaluation cases.

- Case preparation and testimony.

- Curriculum Vitae (C.V.) preparation and maintenance.

68.    A test must be passed at the end of the extensive DRE training in order to receive DRE certification.

69.    Of nearly 11,000 sworn law-enforcement officers across 400 agencies in Minnesota, only 323 officers are currently DREs, according to the Minnesota State Patrol.

70.    Ahead of Jensen's arrival, Kingsley repeatedly stated to Moseng and O'Shea: "I don't know what it is."

71.    Kingsley did not understand what a *name* was – which frustrated Moseng.

72.    Kingsley continued to demonstrate an inability to understand and comply with simple instructions from Moseng.

73.    Because of his inabilities, Moseng had to get Kingsley's driver's license out of his wallet to learn his name and confirm he worked at the post office.

11

74.     Kingsley himself could not confirm either, even when he was *shown* his ID and work card – Kingsley stated: "I don't understand what you're saying."

75.     After obtaining Kingsley's driver's license, O'Shea ran Kingsley's name.

76.     Notably, no criminal history was found.

77.     Jensen arrived at the scene around 10:52 pm – **8 minutes** into the stop.

78.     Upon his arrival, Moseng and Jensen discussed Kingsley.

79.     Moseng and Jensen both muted (but did not *deactivate*) their BWCs for the conversation – something they both would do at times throughout the evening.

80.     There was no valid or necessary reason for either officer to mute his BWC.

81.     According to Eagan's Portable Audio/Video Recorder Policy, "[t]he use of recorders is intended to enhance the mission of the Department by ***accurately*** capturing contacts between members of the Department and the public." (emphasis added).

82.     The Policy required activation of the BWCs during the stop and arrest of Kingsley and through the end of the officers' direct participation in the incident.  Eagan Police Department Policy 423.6 and 423.6.1.

83.     While the Policy provides wiggle room for officers to discontinue recording under certain circumstances, including "whenever it reasonably appears to the member that such privacy may outweigh any legitimate law enforcement interest in recording" and "to exchange information with other law enforcement officers", to mute while discussing concerns for Kingsley's health and well-being or preliminary conclusions in that regard undermines the policy and purpose behind BWC recordings.

12

84.     Thankfully O'Shea's BWC caught some of the conversation between Moseng and Jensen.

85.     During this first of several conversations Moseng and Jensen attempted to hide, Moseng informed Jensen of the following:

- "There's no smell of alcohol";

- Kingsley "denies medical issues";

- Moseng and O'Shea "hadn't done 'fields' yet" because Moseng "wanted [Jensen's] opinion";

- Moseng was **"still not convinced that this isn't medical related more than impairment related"**; and

- That "[Kingsley's] on the struggle bus."

86.     At and even before this time, emergency medical attention should have been obtained for Kingsley due to his obvious and serious medical needs.

87.     The Defendants on scene knew and understood this.

88.     In fact, video from the early morning hours of November 17 – video that Moseng also attempted but failed to hide, as detailed more below – indicates that *before* Jensen's arrival to the scene at 10:52 pm, **Moseng had concluded Kingsley was suffering from a stroke**.

89.     Ignoring what they knew and had observed, Moseng, Jensen, and O'Shea consciously chose to proceed with the stop and eventual arrest of Kingsley absent any evidence of intoxication.

90.     Jensen, despite his significant additional DRE training – his purported purpose at the scene, failed to go through the 12 drug recognition evaluation steps.

13

91.     Jensen ignored his training, which instructed him to conduct the 12-step process in the same manner each time to help ensure no mistakes were made and to eliminate extraneous or unreliable indicators.

92.     All Jensen did was use his flashlight to look at Kingsley's eyes and note that Kingsley could not complete the field sobriety testing, which in and of itself dictated that Kingsley required medical care.

93.     Notably, the BWC evidence shows that Kingsley could not complete the testing because he had difficulty walking, remained off balance, and continued to be unable to understand or follow simple directions, again all of which dictated urgent medical care was necessary.

94.     Jensen confirmed his knowledge of Kingsley's inability to communicate when he said: "You have said pretty much no words to me" at approximately 10:56 pm.

95.     Kingsley's inability to communicate and his confusion were present and worsened throughout the stop, arrest, and his custody.

96.     Despite all of what he knew from Moseng and had observed for himself about Kingsley's obvious and serious physical and mental problems, Jensen consciously chose to ignore his training and the DRE protocol.

97.     Jensen ignored the unassailable fact that Kingsley was suffering from a medical emergency observable from the moment he was stopped.

**Further Confirmation of the Obvious**
**While Precious Time Ticked By**

98.    O'Shea, who had searched Kingsley's vehicle, reported he found nothing to indicate drug or alcohol use.

99.    Moseng confirmed this with his own search of Kingsley's vehicle.

100.    Shortly thereafter, Jensen reported to Moseng that no field sobriety testing would be done.

101.    After learning that no field sobriety testing would occur, Moseng made a call to the post office and discussed Kingsley.

102.    Kingsley continued to express his confusion to O'Shea – he did not know he had been driving the wrong way.

103.    Kingsley did not know who the current President was when asked by O'Shea.

104.    Kingsley did not know what city they were in when asked by O'Shea.

105.    Kingsley continued to repeat: "I just want…"

106.    Moseng and Jensen then rejoined O'Shea and Kingsley and observed more of the same alarming cognitive issues.

107.    Instead of obtaining medical care for Kingsley, these Defendants continued to disregard his obvious medical needs.

108.    Moseng's frustration rose when Kingsley again could not tell Moseng where he worked even though he was still wearing his post office vest – something Moseng callously pointed out to Kingsley.

109.    Shortly thereafter – around 11:01 pm – Jensen and Moseng handcuffed Kingsley and placed him under arrest.

110.    Kingsley was placed under arrest, even though the totality of the circumstances observed by the officers completely undermined any probable cause.

111.    Moseng and Jensen wasted a lot of time hunting for intoxication while a medical emergency stared them in the face.

112.    Moseng asked Jensen if he would do an evaluation – meaning a full DRE evaluation.

113.    DRE protocol required the following twelve-step evaluation:

**Step 1:** Breath alcohol test.

**Step 2:** Interview of arresting officer.

**Step 3:** Preliminary examination and first pulse.

**Step 4:** Eye examinations.

**Step 5:** Divided attention tests.

**Step 6:** Vital signs and 2nd pulse.

**Step 7:** Dark room examination.

**Step 8:** Check for muscle tone.

**Step 9:** Check for injection sites and third pulse.

**Step 10:** Interview, statements and observations of subject.

**Step 11:** Provide his opinion as a DRE.

**Step 12:** Toxicological examination.

114.    Vital signs entail temperature, blood pressure, pulse, respiratory rates and oxygen saturation levels.

115.    Again, the DRE protocol and Jensen's experience and training were the reason Jensen was involved.

116.    Jensen did not perform a full DRE evaluation on scene – or ever while Kingsley was in Eagan's custody.

16

117.   Jensen completed Step 2, and Moseng indicated Kingsley's situation was more likely caused by a medical condition or emergency.

118.   Jensen then only partially completed Steps 3, 4 and 10. But no pulse or other vital signs were taken.

119.   Regarding Step 10, Jensen admitted Kingsley had very little ability to communicate and Jensen observed multiple signs of a medical emergency.

120.   Rather than seeking medical care in the field or by transport to a hospital, Jensen then transferred Kingsley to the Eagan police station, where they arrived around 11:08 pm.

**Kingsley Deteriorated and Exhibited Other Classic Stroke Signs**

121.   In the Eagan Police Department garage, Kingsley stumbled as he exited the squad vehicle.

122.   Kingsley remained confused.

123.   Kingsley entered the police station with Jensen and was told he could sit on a bench. But Kingsley appeared not to understand and remained standing for some time until Jensen told him: "You can sit, it's going to be a while."

124.   It would indeed be a while as Moseng and Jensen worked to obtain a search warrant for Kingsley's blood.

125.   While Kingsley waited, cuffed at the police station, he continued to medically decline.

126.   Kingsley at times nodded off to sleep.

17

127.   Kingsley's right hand and arm showed signs of weakness and/or coordination issues and looked and operated differently from his left hand and arm.

128.   As Defendants knew and were trained, singled-sided weakness or non-function is a telltale sign of a stroke.

129.   Kingsley remained unable to answer the simplest of questions.

130.   At 11:16 pm, Moseng, in a second call with the post office, learned that Kingsley had worked there since 2017 or 2018 and they had had no issues with him.

131.   Around 11:21 pm, Moseng and Jensen *again discussed whether Kingsley could be suffering from a medical issue* but once more failed to obtain any medical care for Kinglsey, even to address their own subjective concerns about his obvious medical needs.

## **Stubborn Deliberate Indifference Continued**

132.   Jensen – sidestepping Moseng's twice-stated concern that Kingsley could be suffering from a medical issue – claimed that if it was not medical, he "would assume a dissociative of some sort" (e.g., Ketamine), which, if it was the cause of Kingsley's physical and cognitive difficulties, would *also* call for urgent medical care.

133.   The *reason(s)* behind Kingsley's signs of a serious medical problem did not matter. Regardless of their cause, Kingsley was showing obvious signs of a serious medical problem that required immediate intervention.

134.   At 11:29 pm, Moseng received a phone call.  This would be his *third* conversation with the post office.

135.   Moseng can be overheard on his BWC noting that he "found" Kingsley.

18

136.    During this or the combination of his three conversations with the post office, Moseng learned that:

- Kingsley's work had not seen him for a while;

- Kingsley had vanished from work;

- Before Kingsley left work, he had been complaining of a headache, a classic stroke symptom;

- Before Kingsley left work, one of his co-workers thought he was losing his mind by how he was acting, another classic sign of a stroke; and

- Kingsley left everything at work, including his cell phone.

137.    Moseng conveyed this information to Jensen.

138.    All of these additional facts indicated that Kingsley was suffering from a medical emergency, such as a stroke.

139.    In fact, Jensen and Moseng *again discussed whether Kingsley was suffering from a medical issue* after the third post office phone call.

140.    Moseng even asked, given all that Kingsley had been complaining about, whether they **should send him to the hospital**.

141.    Maddeningly, Jensen asked: "For what?"

142.    Then Jensen reminded Moseng why sending Kingsley for medical care – despite his obvious and serious medical needs – was *not* the answer:  they would have to put Kingsley on a transport hold if they sent him to the hospital.

143.    A transport hold meant that an Eagan officer would have to remain with Kingsley at the hospital – something Jensen clearly did *not* want to do.

144.    Jensen then switched back to claiming that Kingsley had taken a dissociative drug.

145.    Around 11:50 PM, MHealth emergency medical personnel arrived to the police station to complete Kingsley's blood draw pursuant to a search warrant that Moseng and Jensen had obtained.

146.    Kingsley was asked to scoot over on the bench and did not understand the simple direction.

147.    Kingsley continued deteriorating before Moseng's and Jensen's eyes.

148.    For example, Kingsley had drool in his beard and did not understand Moseng's direction to wipe it off, and so it remained on his face.

149.    EMS did not complete any assessment on Kingsley – they were there solely to complete a blood draw and the necessary paperwork.

150.    However, EMS personnel did ask Moseng if the officers **planned on transferring him to the hospital**, noting that other times when EMS crews had been to the Eagan police station, patients had needed to be transported to the hospital and "it's a whole thing."

151.    Moseng replied that he did not know yet.

152.    Approximately six minutes later, Moseng and Jensen again discussed doing "an evaluation."

153.    Upon information and belief, the "evaluation" was the full DRE protocol.

154.    Jensen favored his own free time over Kingsley's well-being, saying an evaluation would take "two hours to get it done."

155.   Jensen then made a phone call to Ryan Winegardner – another Eagan DRE – to inquire whether a "partial evaluation" could be done.

156.   Jensen muted his BWC for the call to Winegardner.

157.   Yet again there was no legitimate law enforcement reason for Jensen to mute his BWC.

158.   After the call, Jensen's decision *not to* conduct an evaluation was finalized – he "did not want to sit there for two hours when we have more than enough [probable cause]."

159.   Meanwhile, Kingsley remained seated on the bench and continued to show obvious signs of a serious medical condition with no abatement of those signs, which only worsened with the continuing passage of time.

160.   Indeed, none of Kingsley's signs and symptoms of a serious medical need remitted at any time between Moseng's initial traffic stop and Kingsley's eventual transfer, brain dead, from the Jail.

161.   Around 12:15 am on November 17, Jensen told Moseng that a DRE evaluation with Kingsley "would just be a whole bunch of time wasted."

162.   By that point, Jensen had spent **83 minutes** with Kingsley during which his vital signs could have been but were not taken.

163.   Moseng admitted he had **never** seen anyone as messed up as Kingsley, but *still* no medical care was sought.

164.   Jensen admitted: "I'm *guessing* it's drugs."  The "it" was Kingsley's obvious and serious medical needs.

165.    Stating the obvious, Jensen admitted that if he gathered more information through the DRE protocol, such as taking Kingsley's pulse and blood pressure, he would know more.

166.    But still, Jensen refused to further engage in the DRE protocol with Kingsley.

167.    Jensen consciously ignored his training and certification, preferring to save time and make the officers' shift an easier one – at the expense of Kingsley's life.

168.    Gallingly, Jensen and Moseng then discussed Kingsley's muscle tone, which they described as *flaccid*.

169.    Flaccid muscle tone is an objective medical sign of a stroke.

170.    Flaccid muscle tone is what causes the classic facial droop associated with strokes

171.    Flaccid muscle tone, particularly in the facial muscles, can cause drooling similar to that observed on Kingsley's face by Jensen and Moseng.

### Igorning All the Facts, Kingsley was Taken to Jail
### Rather than the Hospital

172.    Minutes later, with the blood draw complete and their decision finalized, Jensen and Moseng proceeded to take Kingsley to the Dakota County Jail – **not the hospital**.

173.    Kingsley stumbled to get up and had difficulty walking back through the police station to the garage, needing the officers' help.

174.    Moseng commented that Kingsley's eyes or pupils were huge.

22

175.    Kingsley continued to stumble with them through the garage, bounced off the garage door, and finally made it to the passenger side of Jensen's squad.

176.    Kingsley struggled to get into the vehicle, and Jensen had to put Kingsley's right foot into the car for him.

177.    Around this time, Moseng had shut off his BWC, *but Jensen had not*.

178.    Jensen went back around to the driver's side of his squad and approached Moseng.  As he did, Moseng stated: **<u>"Before you got there, I was like, is this dude having a stro—"</u>**

179.    "Stroke" is cut off because Jensen muted his BWC as quickly as he could.

180.    Jensen and Moseng then talked with Moseng's BWC off and Jensen's still muted.

181.    Yet again, there was no legitimate law enforcement reason for Jensen to mute his BWC, which violated Eagan policy.

182.    However, from the available video evidence, Moseng appeared to understand he said the quiet part out loud *and* that it was captured on Jensen's BWC.

183.    Moseng pulled his winter hat down over his face in sheepish embarrassment of having let the cat out of the bag.

184.    Moseng then shrugged.

185.    Moseng smiled and/or laughed.

186.    Then, Jensen proceeded to transport Kingsley to the Jail.

187.    Jensen and Kingsley arrived at the Jail around 12:48 am on November 17, 2024.

188.    Upon alerting Jail staff to their arrival, Jensen created more danger for Kingsley by falsely reporting he was there with "[o]ne adult male, *no issues*."

189.    The individually named Dakota County Defendants would soon see otherwise.

190.    Jensen remained with Kingsley at the Jail for some time.

191.    In total, Kingsley was suffering in front of one or more of the individually named Eagan Defendants from 10:44 pm on November 16 (when he was first picked up) to around 1:00 am on November 17 (when he was left at the Jail) – a total of approximately **2 hours and 16 minutes**.

192.    For nearly that entire time, Moseng refused to act on what he *admittedly* thought from the beginning that Kingsley was suffering from a stroke.

193.    For nearly that entire time, Jensen ignored repeated questions about Kingsley's impaired condition being a medical issue and not a drug issue.

194.    Kingsley "was jailed and held due to [his] high level of impairment and the fear that he may hurt himself or others if he [was] immediately released in his current state."

195.    Kingsley was not impaired by anything other than his stroke.

### Rules Governing Admissions to Jail

196.    Chapter 2911 of the Minnesota Administrative Rules provides the minimum standards for correctional facilities in the state, including the Dakota County Jail.

197.    Under Chapter 2911, there are 50 rules and a number of subparts with which Minnesota correctional facilities must comply.

198.    Minnesota correctional facilities – including the Dakota County Jail – must have written policies and procedures for processing new inmates to the facility.  *See* Chapter 2911.2525.

199.    Key to Kingsley's health and safety were Chapter 2911.2525, subparts 1(A) and (E), which among other things required the Jail to have written policies and procedures directing COs on:

- Obtaining and documenting available emergency medical information within *two hours* of admission; and

- Initial medical screening to include an assessment of the inmate's health status, including any medical or mental-health needs.

200.    These were ignored by Defendants Decache, Severson, Strickland, and Marquez upon Kingsley's admission to the Jail.

## Rules Governing Well-Being of Inmates

201.    Chapter 2911.5000, subpart 5, requires that Minnesota correctional facilities – including the Dakota County Jail – have a system for providing for well-being checks of inmates.

202.    The Jail must have "[a] written policy and procedure" providing "that all inmates are personally observed by a custody staff person at least once every 30 minutes." *Id*.

203.    However, "more frequent observation is required for those inmates of a special needs classification." *Id*.

25

204.    Special needs classification means individuals with health conditions that require special accommodations, which includes individuals who are intoxicated, going through withdrawals, or suffering from obvious and serious medical needs without abatement of their signs or symptoms of medical issues.

205.    Chapter 2911.5000 and the regulating agency for Minnesota correctional facilities – the Minnesota Department of Corrections (DOC), through its inspections of the Jail – require a policy and practice for conducting proper well-being checks.

206.    The purpose of well-being checks is to determine that an inmate is alive and well or, conversely, in need of medical or other intervention for the inmate's safety.

207.    Well-being checks are a vital job of COs in correctional facilities.

208.    Well-being checks are the way the COs know what is going on so they can address issues; pass on information to supervisors, medical, or the oncoming shift; and ensure the safety and security of individuals at the facility including the COs themselves.

209.    It is imperative to know *who* conducted the check, *when* the check was completed, *how long* the CO spent with the inmate, and *in what condition* the CO observed the inmate.  As such, accurate documentation of well-being checks is crucial.

210.    The Dakota County Jail required personal observation by the CO conducting well-being checks.

211.    The well-being checks must be documented, along with the times of the checks and notations about inmates.

212.    In 2023, Dakota County selected an electronic inmate management system known as Guardian RFID to streamline the documentation of a wide range of inmate

26

activities, behavioral observations, and inmate movement within the Jail's management system.

213.    The Guardian RFID system was supposed to increase accountability, streamline data collection, and allow for increased staff collaboration and operational awareness at the Jail.

214.    This would – in theory – allow the correctional staff to follow the Dakota County motto: "Be More."

215.    However, here, the Dakota County Defendant COs simply could not have been *any more* deliberately indifferent to the obvious and serious medical needs of Kingsley.

<u>**Limitations of Dakota County Jail Video**</u>

216.    The Dakota County Jail's surveillance video reportedly had no audio in November 2024.

217.    This was unusual.  In November 2024, it was common within Minnesota county jail facilities that surveillance video contained audio.

218.    The Dakota County Jail surveillance video also reportedly had no date or time stamps in November 2024.

219.    This too was unusual.  In November 2024, it was common within Minnesota county jail facilities that surveillance video contained date and time stamps.

220.    The Dakota County Jail surveillance video hallway view of Kingsley's cell did not capture the entirety of the cell window or hallway area.

221.   Further, and improperly, the County reportedly only kept *selected portions* of Jail surveillance video during Kingsley's time at the Jail on November 17, 2024.

222.   Given his classification, medical condition, and subsequent hospitalization and death, the County was required to preserve *all* video from Kingsley's incarceration.

223.   In fact, Minnesota Administrative Rules mandated that the Jail preserve all such video.

224.   But the County was more than happy to allow the objective video evidence of its deliberate indifference be lost.

225.   The combination of the above means that there are evidentiary limitations – at no fault of Kingsley's.

226.   The full extent of these Defendants' misconduct will never be known and warrants a strong sanction.  But even what snuck through to Plaintiffs showed Kingsley required urgent medical attention.

### The Jail Defendants Learn of Kingsley's Serious Medical Needs

227.   According to the Jail Profile Report, Kingsley arrived at the Jail around 1:09 am on November 17, 2024.

228.   Kingsley struggled to get out of Defendant Jensen's squad and then staggered around the sallyport.  His right foot appeared to be dysfunctional – at times dragging behind his body.

229.   One-sided weakness is a known and telltale sign of a stroke.

230.    Loss of balance or coordination and trouble walking are other signs of a stroke.

231.    If there is *any* one sign of stroke, time is critical.

232.    By this time, Kingsley had many objective stroke indicators, including but not limited to: one-sided weakness, loss of coordination, sudden severe headache, vision issues, and confusion.

233.    Even without Eagan police or Dakota County personnel taking Kingsley's vital signs prior to the point when his death was imminent (itself a marker of Defendants' deliberate indifference), Defendants were aware of and deliberately indifferent to the multiple indicators that Kingsley was suffering from a stroke.

234.    Kingsley – still off balance – required assistance to get into the intake area.

235.    In the intake area, Kingsley was unable to hold himself upright – requiring assistance on both of his arms.

236.    A number of Dakota County personnel, including Defendants Decache, Severson, Strickland, and Marquez, interacted with Kingsley upon his arrival to the Jail and for several minutes thereafter.

237.    From their first interactions with Kingsley, Defendants Decache, Severson, Strickland, and Marquez knew of and ignored his obvious and serious medical needs.

238.    Defendants Decache and Severson were the first to respond to the Jail intake area, where they met Defendant Jensen with Kingsley.

239.    Defendants Decache, Severson, and Strickland participated in Kingsley's pat-down search.

240. Defendant Marquez was in the intake room observing for approximately 3 minutes, in close proximity to Kingsley.

241. During his pat-down search, Kingsley needed assistance for balance from officers and the wall, *or both*.

242. Kingsley was next moved into pre-booking.

243. Kingsley required assistance from officers to get there.

244. Defendants Decache and Severson each took one of Kingsley's arms.

245. Defendants Marquez and Strickland followed nearby.

246. Kingsley continued to be extremely off balance, needing assistance to stand.

247. While Defendant Strickland's name appears on much of Kingsley's "attempted booking" paperwork, the video surveillance shows that Defendants Decache, Severson, and Marquez were also involved:



248.    On his booking paperwork, it was incorrectly noted that Kingsley had a "language barrier."

249.    Kingsley spoke English.

250.    Instead, Kingsley could not verbally or otherwise communicate with Defendants Decache, Severson, Marquez, and Strickland in any meaningful way because he was suffering from a medical emergency.

251.    Difficulty with speech is another sign of a stroke.

252.    On his booking paperwork, it was noted Kingsley did not require further evaluation.

253.    Nothing could have been further from the truth – he required emergent medical care, *and time was of the essence.*

254.    Kingsley received none.

255.    Instead, Defendants noted on his booking paperwork that the Jail's medical questionnaire *could not be completed* for Kingsley, in and of itself a reason to call for urgent medical attention.

256.    Again, the questionnaire could not be completed because Kingsley was suffering from a medical emergency and could not participate in the booking process due to his mental and physical difficulties and signs of a serious medical need, begging the question of why the Jail admitted him in the first place.

257.    Reportedly, Strickland signed the Medical Questionnaire at 1:17 am – a mere 6 minutes after his reported arrival to the Jail.

258.    Defendants Decache, Severson, Strickland, and Marquez observed that Kingsley could not participate in the process of admitting him to Jail.

259.    Yet, Kingsley was accepted into the Jail.

260.    Kingsley was next brought to the body scanner, which, upon information and belief, was in a room to the right of the prebooking area.

261.    Defendants Severson and Marquez steadied Kingsley and attempted to get him into the body scanner.

262.    Defendants Decache and Strickland were nearby.

263.    Kingsley swayed in front of the body scanner even with assistance from Marquez and Severson, who appeared amused:



264.    Defendant Severson attempted to kick Kingsley's dragging right foot to get it to move so he could enter the body scanner, to no avail.

265. Eventually, Defendant Decache – fed up with Kingsley's inability to control his body – picked him up and forcefully placed him into the scanner:



266. Defendant Decache also pushed Kingsley's body forcefully in place when he swayed.

267. Kingsley was getting closer to death throughout this inhumane process.

268. Kingsley did not resist but instead was unable to respond to instructions or requests by Defendants Decache, Severson, Marquez, and Strickland.

269. Following the body scan, Kingsley was escorted back through the prebooking area, through the intake area, and through the Jail to his cell:



270.    Defendant Strickland carried Kingsley's jail-issued shoes, which Kingsley could never even put on his feet.

271.    Around this time, Defendant Hernandez joined the group escorting Kingsley, as shown in the above still frame.

272.    Kingsley continued to require assistance walking.

273.    Defendant Decache took Kingsley's right arm, while Defendant Marquez took his left as shown above and below:



274.  Defendants Strickland and Hernandez followed closely behind.

275.  At times, Defendant Decache held Kingsley up by the back of his pants:



276.    Defendant Hedden, who had opened and inspected cell I321 – an intake holding cell – then joined their procession reminiscent of Dead Man Walking.

277.    All observed Kingsley's weakness, loss of balance and coordination, and inability to ambulate on his own, signs of an obvious and serious medical need.

278.    Despite Kingsley's continuing medical emergency, he was placed in cell I321.

279.    Kingsley's cell had floor-to-ceiling windows, several panels wide.

280.    The windows of Kingsley's cell made it easy for anyone passing by to see Kingsley:



281.    Upon being brought into his cell, Kinglsey was initially sat on the bench in the holding cell – shown below.  Kingsley would remain in this cell until it was far too late for any medical intervention to have any effect.



## Kingsley's Last Tortured Hours

282.    Video surveillance captured much of Kingsley's pain and suffering in Cell I321, where he would spend *hours* in pure agony, in the Jail Defendants' custody but without their care.

283.    Initially, in his cell, Kingsley remained off balance.

284.    Kingsley's balance issues were obvious both when seated and standing.

285.    Kingsley continued to be unable to use his right arm and right leg – something that was obvious from the time he exited Defendant Jensen's squad in the Jail's sallyport, throughout the pat down, body scan, and escort to cell I321.

286.    After approximately 15 minutes in his cell, Kingsley stumbled, limped, and bounced off the wall – finally making it to the toilet area.

287.    Kingsley hit his head on the partition wall of the toilet area:



288.    Then, Kingsley sat on the toilet for several minutes.

289.    Upon his initial attempt to stand up off the toilet, Kingsley fell backwards onto the toilet.

290.    Upon his second attempt to stand up off the toilet, Kingsley stumbled and then fell to the ground, with his underwear and pants down:



291.    Kingsley's underwear and pants remained down, below his buttocks, for some time as he rolled around on the floor of his cell:



292.    After approximately 5 minutes on the ground, Kinglsey reached out towards the cell door as if for help:



293.    No help would come.

294.    Kingsley remained on the ground for approximately 45 minutes – at times flopping to his side or supine position.

295.    At other times, Kingsley would lie motionless – appearing exhausted.

296.    Kingsley then appeared to look towards the cell door for help, again reaching his arm out:



297.    According to the available surveillance video, by this time – roughly an hour and 13 minutes into Kingsley's time in the cell – multiple officers had walked by Kingsley and ignored signs of his obvious and serious medical needs.

298.    The officers who had walked by in the first hour and 13 minutes included *at least* Defendants Hedden, Decache, Hernandez, Marquez, and Corbin– some having done so multiple times.

299.    These Defendants either saw Kingsley suffering and did nothing or deliberately buried their heads in the sand, engaging in willful blindness, to what was so

obvious: an individual suffering from obvious and severe medical needs. Both are markers for deliberate indifference. *See McCaster v. County of Ramsey*, 802 F. Supp. 2d 999, 1010 (D. Minn. 2011) (quotation omitted) ("[B]lindly closing one's eyes to the obvious—in this case, an obvious medical need—is a 'species of intent' sufficient to support a finding of deliberate indifference.").

300. Further, putative "well-being" checks were completed by Hedden, Hernandez, and Marquez over that time period. Each indicated Kingsley's activity as: "**Inmate and Cell OK**".

301. Kingsley was obviously *not* "OK." He was dying.

302. Shortly thereafter, Defendant Strickland went up to the window and easily observed Kingsley suffering but consciously chose not to get him medical care:



303.    More officers did the same – including Defendant Decache who watched

Kingsley *several* times in a manner similar to that depicted in the below still frames from

Jail surveillance video:





304.    Making Decache's decision to observe Kingsley's deterioration and suffering more disturbing and sadistic was the fact that Decache was *not tasked* with the job of completing well-being checks on Kingsley.

305.    Reportedly, Decache was "checking" on Kingsley to see if he could complete the "pre-booking."

306.    Clearly, Kingsley was in no shape to do so as he rolled around suffering from obvious and serious medical needs while Decache *watched*.

307.    Throughout the next 40 minutes, additional COs walked by Kingsley and ignored his continuing obvious and serious medical needs – including but not limited to Defendants Strickland, Decache, and Hedden.

308.    Again, these Defendants either saw Kingsley suffering and did nothing or engaged in willful blindness to what was so obvious.

309.     Additional putative "well-being" checks were completed by Strickland and Hedden during these 40 minutes and, again, Kingsley's activity was marked: "**Inmate and Cell OK**".

310.     Kingsley was obviously *not* "OK."  He was dying.

311.     Yet, none of the COs who observed Kingsley's deterioration and suffering, including the named Defendants, did anything to help Kingsley.

312.     And none of the COs who observed Kingsley's deterioration and suffering, including the named Defendants, got him the urgent medical care he so obviously needed.

313.      After being in the cell for approximately 1 hour and 54 minutes, Kingsley urinated himself, soaking his pants – a telling sign of severe neurologic impairment:



314.     Throughout the next 1 hour and 30 minutes, additional COs walked by Kingsley and ignored his continuing obvious and serious medical needs – including but

not limited to Defendants Hernandez, Strickland, Hedden, Decache, Corbin, Severson, and Marquez.

315.    Defendants Hernandez, Strickland, Hedden, Decache, Corbin, Severson, and Marquez continued to engage in deliberate indifference by ignoring what they knew or through willful blindness.

316.    Additional "well-being" checks were completed by Defendants Strickland and Hedden during that next 1 hour and 30 minutes and, again, Kingsley's activity was marked: "**Inmate and Cell OK**".

317.    Again, Kingsley was not "OK."  He was dying.

318.    The Jail surveillance video shows that Kingsley went on to urinate himself again and again – having lost complete control of his bladder, again an important medical sign.

319.    His pants, cell, and body became wetter and wetter as he rolled around in agony and in his own urine for the next hour and a half:









320.    The Jail surveillance video shows Kingsley continued to remain on the floor of his cell.

321.    The Jail surveillance video shows Kingsley's continued and worsening loss of control and use of the right side of his body.

322.    The below still frames show Defendants Hernandez, Marquez, Strickland, and Hedden looking into his cell, possibly performing putative "well-being" checks, at various times during Kingsley's continued suffering and deterioration:







323.    Decache also continued his viewing of Kingsley's suffering:



324.    Additionally, three hours and 18 minutes into Kingsley's time in cell I321, Defendants Strickland and Decache – the two COs captured on camera watching Kingsley the most – can be seen watching him *together* from the windows of his cell:



325.    Still, none of the COs who observed Kingsley's deterioration and suffering, including the named Defendants, did anything to help Kingsley.

326.    And none of the COs who observed Kingsley's deterioration and suffering, including the named Defendants, got him the urgent medical care he so obviously and desperately needed.

327.    It was not until approximately 3 hours and 22 minutes after Kingsley was brought to his cell that Defendant Corbin asked Defendant Decache about Kingsley.

328.    Portions of this interaction were caught on video.

329.    Defendant Corbin pointed into Kingsley's cell, appeared to mimic Kingsley's outstretched arm, and then Decache came to take *another* look:





330.    Defendant Corbin would later write that she noticed Kingsley **was foaming at the mouth and having seizure-like activity**.

331.   According to Corbin's report, Defendant Decache said to her Kingsley that "had been like that all night" and "he's fine."

332.   So, Defendant Corbin went back to her unit approximately a minute and a half after stopping at Kingsley's cell.

333.   Defendant Decache also *walked away*.

334.   Someone exhibiting these classic signs of obvious and serious medical problems is not **FINE**.

335.   To walk away from someone *foaming at the mouth* without obtaining urgent medical care was the epitome of deliberate indifference.

336.   Minutes later Defendant Decache and Nurse Holman entered Kingsley's cell.

337.   At this point, Kinglsey had been in his cell suffering for over 3 hours and 26 minutes (and suffering inside the Jail with the Defendant COs for even *longer*).

338.   By this point, Kingsley was cold to the touch and unresponsive to painful stimuli.

339.   Kingsley's pupils were pinpoint, fixed, and non-reactive to light.

340.   Kingsley's tongue was white/gray and protruding from his mouth.

341.   Kingsley was making snoring respirations and continued to foam at the mouth.

342.   Kingsley's feet were grayish in color.

343.    Yet, this would be the first time Kingsley's vitals were taken or attempted to be taken from the time he was stopped by Defendant Moseng – another marker for deliberate indifference.

344.    Reportedly, no blood pressure reading could be obtained by Nurse Holman via the blood pressure cuff, but EMTs who arrived a short time later (as described below) were quickly able to get a blood pressure, which was astronomically high at 240/216 – a hypertensive crisis (which begins at a reading of 180/120).

345.    Reportedly, Nurse Holman obtained varied readings for Kingsley's heart rate – between the 60s to the 110s.

346.    Narcan was administered three times *without any response*.

347.    Administering Narcan without a response informed the COs that Kingsley was not suffering from drug intoxication.

348.    Kingsley continued to make snoring respirations.

349.    Kingsley remained unresponsive to stimuli, including sternal rubs and calling out his name.

350.    Gallingly, Defendants Marquez and Strickland performed "well-being" checks while Kingsley was in this state and again marked: "**Inmate and Cell OK**".

351.    Eventually, EMS was called.

352.    The Hastings Ambulance service arrived on scene around 4:56 am.

353.    Notably, the EMS report noted that Kingsley had been suffering from an altered mental status at the Jail *for 3 hours*.

354.    Kingsley remained unresponsive, but reportedly opened his eyes to painful and verbal stimuli.

355.    Kingsley was entirely unable to communicate.

356.    Defendants Severson and Decache, along with other COs, carried Kingsley by his arms and feet to get him onto a gurney, where they then cuffed and shackled his cold, grey limbs:



357.    Kinglsey was transported by ambulance to Regina Hospital where he arrived at 5:21 am.

## Brain Death

358.    Kingsley was an urgent admission to the emergency department.

359.    Kingsley's blood pressures in the ED measured as high as 238/165 and remained critically high through the assessment in the emergency room.

360.    Kingsley remained unresponsive and nonverbal.

361.    Kingsley's pupils were unequal but reactive to light.

362.    Kinglsey had abnormal movements of his left leg and right arm – something observed in patients with severe brain damage.

363.    Kingsley's alcohol and drug screens were negative.

364.    A CT scan of Kingsley's head showed a large intraparenchymal hemorrhage, measuring 8.7 x 5.9 x 3.9 cm, with surrounding edema (swelling), and mass effect causing a midline shift and uncal herniation.  The hemorrhage extended into the ventricles and a small volume subarachnoid hemorrhage.

365.    In other words, Kingsley had a massive brain bleed that had caused his brain to shift and his brain stem to squeeze out of the bottom of his skull.

366.    At 6:00 am, nursing staff observed "decorticate posturing of both [of Kingsley's] arms," which indicated severe brain damage.

367.     It was determined that Kingsley required a higher level of care, and he was transferred to United Hospital, leaving Regina Hospital around 9:28 am.

368.    At United Hospital, Kingsley was admitted with a "Chief Complaint" of "Altered level of consciousness."

369.    It was noted that Kingsley's head CT showed a large intraparenchymal hemorrhage with midline shift and uncal herniation, and that his toxicology screens were all negative.

370.    Kingsley had been intubated.

371.    Kingsley was found to have coffee-ground gastric contents, indicating a GI bleed.

372.    Kingsley's pupils were fixed and dilated, and he had no corneal or cough reflexes.

373.    Neurosurgery indicated there was nothing they could do to improve Kingsley's condition.

374.    Physicians did what they could to try to reduce the swelling in Kingsley's brain, but his prognosis remained dire.

375.    A brain death evaluation performed on November 18, 2024, confirmed that Kingsley was brain dead.

376.    As part of that evaluation, a CT angiogram demonstrated that the increased intracranial pressure had cut off blood circulation to Kingsley's brain.

377.    After discussion with Kingsley's family, in which the doctors explained that he could not survive, Kingsley was disconnected from the ventilator and declared dead when his heart stopped at 12:32 pm on November 19, 2024.

## Autopsy

378.    On November 20, 2024, Kingsley's autopsy was performed by the Ramsey County Medical Examiner.

379.   The final anatomic diagnosis was intracerebral hemorrhage of the left cerebral hemisphere with diffuse cerebral edema and mass effect resulting in left to right midline shift and left uncal herniation.

380.   Again, Kingsley's toxicology findings were negative except for the medication which had been administered as part of his hospitalization.

## Damages

381.    Kingsley incurred special damages prior to his death, including but not limited to ambulance, EMS, and hospital charges and medical bills from Regina and United Hospitals and physicians associated therewith.

382.   Rather than be responsible for their actions and pay for a brain-dead individual's medical care under Minn. Stat. § 641.15, subdivision 2, Defendant Dakota County had Kingsley furloughed, leaving the bills for him, his family, or the taxpayers to deal with.

383.   They were all too happy to take him into custody and then all too happy to cut him loose when they were going to have to pay for Kingsley's medical care.

384.   Kingsley suffered a loss of economic opportunity.  He was gainfully employed with the United States Postal Service at the time of this death.

385.   As Moseng was told during one of his calls with the post office, there were no issues with Kingsley at work.

386.   Kingsley was a hard worker, team player, and helped train or provided guidance to other co-workers.

387. Kingsley suffered extreme physical and mental pain and suffering from 10:44 pm on November 16 through his death on November 19.

388. Kingsley suffered a loss of future enjoyment of his life.

389. Kingsley also lost property with equity, including but not limited to a townhome, vehicle, and other items of personal property as a direct result of Defendants' misconduct.

390. Plaintiffs are entitled to recover these damages for Kingsley.

### DOC Investigation and Inspections

391. The DOC performed an investigation into Kingsley's death.

392. Through its investigation, the DOC found that – in violation of Chapter 2911.1350 – *none of the CO staff were current with their first aid and CPR certifications*.

393. In fact, ACH had last provided that training to the COs in June of 2022 – nearly a year and a half before Kingsley's incarceration at the Jail.

394. ACH reportedly did not have any instructors available for the Jail in 2024.

395. This fact was *known* to Defendant Dakota County.

396. Dakota County knew that COs would encounter intoxicated individuals.

397. Dakota County knew that COs would encounter medically ill individuals.

398. Dakota County knew that COs would encounter individuals suffering from medical emergencies.

399. Despite the knowledge that its COs had not received the required training on a timely basis *and* the knowledge that COs encounter individuals with a variety of

medical issues, Dakota County chose not to obtain first aid and CPR training for its COs in the year and a half before Kingsley's incarceration.

400.    This conscious choice by Dakota County to not provide first aid and CPR training to its COs was substantially certain to result in a deprivation of inmates' constitutional rights – nearly ensuring that COs turned a blind eye to serious and obvious medical issues, just as they did for Kingsley.

401.    As a result of the DOC's investigative findings, Dakota County was required to obtain the mandatory first aid and CPR training for its COs from an outside vendor – something that could have easily been done prior to Kingsley's death.

402.    The DOC also found that – in violation of Chapter 2911.2525, subpart 1 – the CO Defendants entirely failed to obtain and document emergency medical information from Kingsley within two hours of his admission to the Jail.  They also failed to conduct a mental-health screening and did not complete a release of information as required.

403.    As the video shows, this violation was because Kingsley could not engage in the process.

404.    Yet, as the DOC noted, there was no documentation of any refusal to book for Kingsley.

405.    Dakota County was required, due to this violation, to retrain COs with regard to intake and booking.  Specifically, the DOC required this training to include a review of polices and procedures related to intake and booking and a review of the steps

COs must follow if an inmate is uncooperative during the booking process (*i.e.,* unable to engage with the booking process like Kingsley).

406.    In addition to these issues, the Jail has historically had issues with well-being checks conducted by COs.

407.    In the DOC's 2021 inspection of the Jail, a review of video found that well-being checks were being completed too quickly and otherwise out of compliance with state law.

408.    Widespread issues with the well-being checks occurred during Kinglsey's time at the Jail.

409.    The Defendant COs' logging of well-being checks at times failed to indicate *who* conducted the check.

410.    In every instance, the Defendant COs' logging of well-being checks failed to indicate *how long* the CO spent with the inmate and *in what condition* the CO observed the inmate.

411.    The Guardian system was meant to do exactly what the COs failed to do –, streamline the documentation of a wide range of inmate activities, behavioral observations, and inmate movement within the Jail's management system; and increase accountability at the Jail – i.e., enhance safety and security.

412.    The failure to enforce the proper use of the Guardian system for the stated intended purposes is akin to deliberate indifference.

413.    Because of this virtually nonexistent record keeping, Jail surveillance video is needed.

414. Review of the available video evidence shows that each Defendant CO tasked with completing well-being checks on Kingsley either: 1) did so in such a perfunctory manner as to amount to no check at all; and/or 2) chose to do nothing to help Kingsley, who was suffering from observed and obvious serious medical needs.

415. Review of the available video evidence likewise shows Defendant COs not tasked with completing well-being checks on Kingsley – particularly Decache – availed themselves of the prominent windows in his cell and watched Kingsley suffer *for no apparent reason within their job duties* and did nothing to help.

416. The purpose of the large and prominent windows in the cell is for Jail employees to observe and respond to the behavior and condition of detainees, like Kingsley, and to complete adequate well-being checks.

417. Yet, Defendants, including Decache, perversely used them for easy viewing of Kingsley's suffering and death rather than actually *checking* on Kingsley's *well-being*.

418. The County failed to correct known issues with well-being checks at the Jail, dating at least back to 2021 – all of which relate to tasks that affect safety and security of persons at the Jail.

419. Instead, these issues persisted in November 2024 and during Kingsley's incarceration.

420. This emboldened the CO Defendants to mark Kingsley as "OK" when he was, in fact and *obviously*, dying.

## COUNT ONE

### 42 U.S.C. § 1983
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiffs v. Defendants Moseng, O'Shea, and Jensen*

421.    Plaintiffs reallege and incorporate by reference herein each and every allegation in each paragraph above as if fully set forth herein.

422.    The combination of loss of coordination, sudden severe headache, vision issues, confusion, inability to communicate, and uncontrolled drooling constitutes an obvious and serious medical need.

423.    Shortly after Defendant Moseng pulled Kingsley over, he exhibited loss of coordination and severe confusion, both of which were witnessed and appreciated by Moseng, O'Shea, and Jensen.

424.    Defendants Moseng and Jensen obtained additional information throughout their prolonged interaction with Kingsley, including that he suffered sudden severe headache, vision issues, and uncontrolled drooling.  They also witnessed right-sided weakness and/or dysfunction—additional signs of a serious medical need.

425.    By initiating a traffic stop and placing Kingsley under arrest, Defendants Moseng, O'Shea, and Jensen restrained Kingsley's liberty and rendered him unable to meet his own medical needs.

426.    Defendants Moseng, O'Shea, and Jensen had a constitutional duty to provide for the safety and general well-being and to obtain medical care for Kingsley while he was in their custody.

427.    Defendants Moseng, O'Shea, and Jensen, under color of state law, acted with deliberate indifference to Kingsley's life-threatening medical needs while he was in their custody, consciously ignoring the red flags that illustrated Kingsley was a very ill individual, in acute distress, medically declining, and in need of urgent medical care. These actions or inactions were done in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

428.    Defendants Moseng, O'Shea, and Jensen subjected Kingsley to these deprivations of his rights either maliciously or by acting with reckless disregard for whether Kingsley's rights would be violated by their actions or inactions.

429.    Defendant Jensen's actions and inactions are particularly disturbing given he was the DRE on scene with additional training and certification.

430.    Kingsley endured severe physical and mental pain and suffering and died as a direct and proximate result of the acts and omissions of Defendants Moseng, O'Shea, and Jensen.

431.    Punitive damages are available against Defendants Moseng, O'Shea, and Jensen and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983).

432.    Plaintiffs are entitled to recover their costs, including reasonable attorneys' fees under 42 U.S.C. §1988.

## COUNT TWO

### 42 U.S.C. § 1983
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiffs v. Defendants Decache, Corbin, Strickland, Hernandez, Hedden, Severson, and Marquez*

433.    Plaintiffs reallege and incorporate by reference herein each and every allegation in each paragraph above as if fully set forth herein.

434.    The combination of one-sided weakness, loss of coordination, sudden severe headache, vision issues, confusion, inability to communicate, loss of balance, inability to ambulate on his own, and loss of bladder control constitutes an obvious and serious medical need.

435.    Shortly after Kingsley's arrival to the Jail, he exhibited one-sided weakness, loss of coordination, sudden severe headache, vision issues, confusion, inability to communicate, loss of balance, inability to ambulate on his own, and loss of bladder control.

436.    Defendants Decache, Corbin, Strickland, Hernandez, Hedden, Severson, and Marquez had a constitutional duty to provide for the safety and general well-being of and to address the medical needs of Kingsley as an inmate at the Jail.

437.    Defendants Decache, Corbin, Strickland, Hernandez, Hedden, Severson, and Marquez, under color of state law, acted with deliberate indifference to Kingsley's life-threatening medical needs during his confinement at the Dakota County Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

438.    Defendants Decache, Corbin, Strickland, Hernandez, Hedden, Severson and Marquez, under color of state law, knew of and disregarded obvious and serious risks to Kingsley's health and safety and acted with deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

439.    Defendants Decache, Corbin, Strickland, Hernandez, Hedden, Severson, and Marquez subjected Kingsley to these deprivations of his rights either maliciously or by acting with reckless disregard for whether Kingsley's rights would be violated by their actions or inactions.

440.    Kingsley endured severe physical and mental pain and suffering and died as a direct and proximate result of the acts and omissions of Defendants Decache, Corbin, Strickland Hernandez, Hedden, Severson, and Marquez.

441.    Punitive damages are available against Defendants Decache, Corbin, Strickland, Hernandez, Hedden, Severson, and Marquez and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983).

442.    Plaintiffs are entitled to recover their costs, including reasonable attorneys' fees under 42 U.S.C. §1988.

### COUNT THREE

### CIVIL RIGHTS VIOLATIONS
### *MONELL V. DEP'T OF SOCIAL SERVICES*
### *Plaintiffs v. Dakota County*

443.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained above as if set forth fully herein.

444.    Defendant Dakota County is liable under *Monell* for deliberate indifference caused by a policy, custom, or practice, as it relates to ACH and its agents.

445.    ACH's operation at the Jail is akin to other for-profit contracted medical providers that cut costs by utilizing lesser-qualified medical staff and operate on the cheap to the detriment of inmates, such as Kinglsey, posing risks to their health and safety.

446.    While a municipality, such as Dakota County, may contract with a private medical provider such as ACH to provide medical services to inmates, doing so "does not relieve [it] of its constitutional duty to provide adequate medical treatment to those in its custody," nor does it immunize a municipality from liability for failing to fulfill that duty. *West v. Atkins*, 487 U.S. 42, 56 (1988).

447.    When an inmate has serious medical needs that require medical treatment, the County through "prison officials [is] under a constitutional duty to see that it is furnished." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989).

448.    From his arrival to the Jail forward, it was obvious that Kingsley exhibited one-sided weakness, loss of coordination, sudden severe headache, vision issues, confusion, inability to communicate, loss of balance, inability to ambulate on his own, and loss of bladder control.

449.    The combination of one-sided weakness, loss of coordination, sudden severe headache, vision issues, confusion, inability to communicate, loss of balance, inability to ambulate on his own, and loss of bladder control constitutes an obvious and serious medical need.

450.    The individually named CO Defendants' failure to obtain urgent medical care or otherwise assist Kingsley as he suffered from obvious and serious medical needs was due to Dakota County's initiation of, tolerance of, permission of, failure to correct, promotion of, or ratification of customs, patterns, or practices that permitted them to fail to provide for the safety and general well-being of inmates, fail to care for inmates suffering from obvious and serious medical needs, and fail to seek necessary medical care for inmates.

451.    Dakota County's longstanding initiation of, tolerance of, permission of, failure to correct, promotion of, or ratification of customs, patterns, or practices of: 1) performing well-being checks in such a perfunctory manner as to amount to no checks at all; and/or 2) performing adequate well-being checks but choosing to do nothing to help an inmate who was suffering from observed serious medical needs, resulted in the individually named CO Defendants' failure to obtain emergent medical care or otherwise assist Kingsley during his incarceration.

452.    Additionally, Dakota County's longstanding initiation of, tolerance of, permission of, failure to correct, promotion of, or ratification of customs, patterns, or practices of permitting COs to ignore individuals suffering from obvious and serious medical needs, including but not limited to those suffered by Kingsley, despite their observation and interaction with inmates resulted in the individually named CO Defendants' failure to obtain emergent medical care or otherwise assist Kingsley during his incarceration.

453.    Kingsley exhibited obvious and serious medical needs, including but not limited to one-sided weakness, loss of coordination, sudden severe headache, vision issues, confusion, inability to communicate, loss of balance, inability to ambulate on his own, and loss of bladder control.  He consistently deteriorated during his stay at the Jail, and he suffered and died as a result of the County's multifaceted deliberate indifference that resulted in Kingsley receiving no care, intervention, or treatment for his obvious and serious medical needs before it was far too late.

454.    Plaintiffs are entitled to recover their costs, including reasonable attorneys' fees under 42 U.S.C. §1988.

## COUNT FOUR

### CIVIL RIGHTS VIOLATIONS
### *CITY OF CANTON V. HARRIS*
### *Plaintiffs v. Dakota County*

455.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained above as if fully set forth herein.

456.    Defendant Dakota County, with deliberate indifference to inmates at the Dakota County Jail, failed to properly train correctional and medical staff and failed to adopt, implement, or require adherence to appropriate policies regarding: 1) refusal to admit to jail; and 2) the recognition of serious medical needs.

457.    COs routinely encounter individuals who are ill, intoxicated, withdrawing, or suffering from medical emergencies.

458.    To ensure inmates receive appropriate medical care, which the County is constitutionally required to provide, it is imperative that COs receive the required training

regarding recognizing the signs and manifestations of serious medical needs and steps to address those needs – including first aid and CPR training.

459.    The failure to provide that training to COs by Dakota County results in the high likelihood of the failure to provide constitutionally required medical care to inmates in the custody of Dakota County.

460.    The failure to provide the required training to COs by Dakota County makes it substantially certain that a violation of an inmate's constitutional rights will occur.

461.    The failure to provide the required training to COs by Dakota County poses serious risks of injury or death to inmates in the custody of Dakota County.

462.    Defendant Dakota County, by such conduct, demonstrated deliberate indifference and a protracted failure to care for the safety of Kingsley, who had a constellation of signs of an obvious and serious medical need.

463.    Kingsley's death and the violation of his civil rights were directly and proximately caused by the complete failure to ensure its COs received the mandatory training, and Dakota County is thereby liable in an amount as yet to be determined.

464.    Plaintiffs are entitled to recover their costs, including reasonable attorneys' fees under 42 U.S.C. §1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Josephine Adu-Gyane and Rosalind Marie Lewis as co-trustees for the next-of-kin of Kingsley Fifi Bimpong pray for judgment against Defendants as follows:

70

1.      That this Court find that the Defendants committed acts and omissions constituting violations of the Eighth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.      As to Count I, a money judgment against Defendants Joseph Moseng, Liam O'Shea, and Martin Jensen in the amount of $20 million for compensatory damages and $20 million for punitive damages, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

3.      As to Count II, a money judgment against Defendants Eduardo Decache, Brittany Corbin, Ramsey Strickland, Manuel Hernandez, Heather Hedden, Christoper Severson, and Lucio Manuel Marquez Zazueta in the amount of $20 million for compensatory damages and $20 million for punitive damages, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

4.      As to Count III, a money judgment against Defendant Dakota County for compensatory damages in the amount of $20 million, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

5.      As to Count IV, a money judgment against Defendant Dakota County for compensatory damages in the amount of $20 million, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

6.      For an order mandating changes in the policies and procedures of the Dakota County Jail, requiring among other things changes to policies and training to ensure that individuals suffering from obvious and serious medical needs are provided urgent medical intervention and care; and

7.     For such other and further relief as this Court may deem just and equitable.

**PLAINTIFFS DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated: October 9, 2025                    **ROBINS KAPLAN LLP**

                                          **/s/ Kathryn H. Bennett**

                                          Robert Bennett, #6713
                                          Andrew J. Noel, #322118
                                          Kathryn H. Bennett, #0392087
                                          Marc E. Betinsky, #0388414
                                          Greta A. Wiessner, #0401130
                                          800 LaSalle Avenue, Suite 2800
                                          Minneapolis, MN 55402
                                          Telephone:  612-349-8500
                                          rbennett@robinskaplan.com
                                          anoel@robinskaplan.com
                                          kbennett@robinskaplan.com
                                          mbetinsky@robinskaplan.com
                                          gwiessner@robinskaplan.com

                                          ***Attorneys for Plaintiffs Josephine Adu-
                                          Gyane and Rosalind Marie Lewis***